122 So.2d 218 (1960)
SIESTA PROPERTIES, INC., Appellant,
v.
Louis C. HART, Irene Hart et al., Appellees.
No. 918.
District Court of Appeal of Florida. Second District.
July 6, 1960.
Rehearing Denied August 2, 1960.
*219 Williams, Parker, Harrison & Dietz, Sarasota, for appellant.
Thomas W. Butler, Sarasota, for appellees, R.A. Holman and wife, Mary Holman, and Robert E. Graetz and wife, Gertrude E. Graetz.
Burket, Burket & Smith, Sarasota, for appellee, Alice W. Beebe.
Evans, Glenn & Kreag, Sarasota, for appellee, Elizabeth Hulda Peppe.
SEBRING, HAROLD L., Associate Judge.
Siesta Key, Inc., the plaintiff below, has taken this appeal from a final decree dismissing its amended complaint in a suit instituted to quiet the title to certain lands claimed by the plaintiff. The defendants have filed cross assignments of error questioning certain adverse rulings in the decree.
The basic facts of the case are these: Siesta Key is an off-shore island in Sarasota County, Florida, situated westwardly of the mainland. Between the island and the mainland is Little Sarasota Bay. West of the southerly portion of Siesta Key and extending southward was a narrow elongated island, known as Casey Key, which, prior to 1918, was some 12 or 14 miles in length. Separating Siesta Key from Casey Key was a narrow body of tidal water, known as Little Sarasota Pass, which connected, off the southerly tip of Siesta Key, with Little Sarasota Bay, and opened into the Gulf of Mexico, at its northerly end, through a narrow tidal channel known as Little Sarasota Inlet.
During a heavy gale in 1918, the waters of the Gulf of Mexico broke through Casey Key and into Little Sarasota Bay at a point south of the southerly tip of Siesta Key, thus creating a direct channel for the flow of Gulf waters into and out of Little Sarasota Bay.
Heavy washing of sand and soil by gale winds that hit the area in 1921 almost closed Little Sarasota Inlet, and shortly after the storm artificial filling of the Inlet by adjacent property owners completely closed it. Thus, Casey Key, which prior to 1921 had been an island, thereupon became a narrow peninsula some 3 miles in length, extending from its point of attachment with Siesta Key on the north to the 1918 breakthrough, known as Midnight Pass, on the south.
The plaintiff, or its predecessor in title, claimed fee-simple ownership of a tract of land on Casey Key which was situated approximately midway between the northern tip and the southern tip of the peninsula. The property ran from the Gulf of Mexico, on the west, to Little Sarasota Pass, on the east, and riparian rights were claimed by the plaintiff on both bodies of water. The defendants, or their predecessors in title, were fee-simple owners of properties on Siesta Key which were situated directly *220 across Little Sarasota Pass from the property claimed by the plaintiff. These properties ran from Little Sarasota Bay, on the east, to Little Sarasota Pass, on the west, and the defendants claimed riparian rights on both bodies of water.
A severe hurricane struck the area on the night of September 18, 1926. The following morning, when the winds had subsided to the point that an inspection could be made, it was found that the waters of Little Sarasota Pass, in front of defendants' lands, had been completely replaced during the night by soil deposits extending westwardly from the defendants' westerly shore lines on Little Sarasota Pass out to the open waters of the Gulf of Mexico. North of the northern boundary line of defendants' properties, Little Sarasota Pass had become an enclosed lake bounded on the west by the northern portion of Casey Key, on the east by the westerly shore line of a portion of Siesta Key and on the south by the lands that had filled a portion of Little Sarasota Pass during the night. While Little Sarasota Pass, south of the southerly line of defendants' properties, still remained a part of Little Sarasota Bay, it was now bounded on the east by the southerly portion of Siesta Key, on the west by the southerly portion of Casey Key and on the north by the soil that had been deposited on the westerly shore line of defendants' properties.
The present suit was instituted by the plaintiff against the defendants in 1955. In the complaint, as amended, the plaintiff alleged that it was the owner in fee-simple absolute of a certain tract of land in Sarasota County, Florida, described as U.S. Government Lot 5, Section 32, Township 37 South, Range 18 East (less a certain portion of Lot 5 not involved here); that the lands were wild, unimproved and unoccupied; that title to the property was acquired by plaintiff from one E.S. Boyd, individually and as trustee, and his wife Helen Boyd, by warranty deed duly executed and delivered on March 18, 1946; that plaintiff's property, together with certain lands to the north and south of said property originally constituted a part of an island known as Casey Key, lying between the Gulf of Mexico on the west and Little Sarasota Pass on the east; that defendants' properties were located on an island known as Siesta Key and were originally bounded on the west by Little Sarasota Pass; that over the years, as the result of shifting sands caused by the action of tides, winds and storms, a portion of Casey Key on which a part of the plaintiff's property opposite the defendants' properties was located, without ever losing its identity as such, gradually moved easterly across Little Sarasota Pass and eventually joined with Siesta Key and thus completely closed Little Sarasota Pass along its entire area adjacent to the properties of the defendants; that when Boyd, plaintiff's predecessor in title, acquired title to the property claimed by the plaintiff it was completely connected with the parcels of land owned by the defendants on Siesta Key, and was completely "high and dry, bounded by high and dry land on the east, north, and south, and bounded by the Gulf of Mexico on the west"; that none of the defendants was in possession of any portion of the plaintiff's property nor did they claim title to any portion of U.S. Government Lot 5, as such, but based their respective claims to plaintiff's property as accretions to their own lands lawfully acquired by deed; that the property claimed by plaintiff was not an accretion to any portion of defendants' properties but the joinder of plaintiff's property with the adjacent property on Siesta Key had been effected by the gradual moving eastward of Casey Key until plaintiff's lands had become attached to the westerly shore lines of the defendants' properties.
The prayer of the amended complaint was that a final decree be entered in which the plaintiff be decreed to be the owner in fee simple of the property claimed and that the title of plaintiff thereto be forever *221 quieted and confirmed as against any and all right, title, claim or interest of the defendants, and all persons claiming by, through or under them.
The defendants filed answers to the amended complaint in which they denied that the land claimed by the plaintiff was wild, unoccupied and unimproved, denied that the island on which the lands were situated had "gradually moved over" from its original site until it had become annexed to the properties of the defendants, and asserted the defense of adverse possession by occupation of the property as a beach, swimming, picnicking and fishing area for a continuous period of more than 7 years, and by the payment of taxes, and the defenses of estoppel and laches.
At final hearing on the merits, the trial court, on July 25, 1958, entered a final decree in which it found that as to the claim of the defendants, Louis C. Hart and Irene M. Hart, his wife, the plaintiff was barred from the relief prayed, on the ground of laches. No appeal was ever taken from this partial final decree and this decree has now become final.
Subsequently, on August 13, 1958, the trial court entered a final decree as to the other defendants which ordered the dismissal of plaintiff's cause, with costs, as to all parcels of land involved in the suit. In support of the final decree, the trial court filed a written opinion, and, subsequently, a supplemental written opinion, in which was set forth the reasons for the final decree that was entered
In the original opinion was a finding by the trial court that the defendants had failed to establish title to the disputed lands by adverse possession or that (except as to the defendants, Hart and wife) they were entitled to prevail on the grounds of estoppel or laches.
As we view the evidence, the trial court was correct in these findings and hence the decree in this particular must be affirmed.
The trial court also found in its written opinions that the defendants could not claim any right to the lands in question under the theory that the lands were accretions, because "in order for an owner of land bounding upon water to claim additions to such land as accretion, such accretion must begin upon the land of such riparian owner and not upon some other place from which it may eventually extend until it reaches claimant's land," and the testimony as a whole "shows without question that all the soil deposited in the channel [of Little Sarasota Pass] and against [the properties of the defendants] came from elsewhere  most conceivably from the surface soil of Casey Key, or possibly from the submerged soil of the Gulf."
Since the law supports the statement of the trial court concerning the right to accretions, Mexico Beach Corporation v. St. Joe Paper Co., Fla., 97 So.2d 708; Paxson v. Collins, Fla.App., 100 So.2d 672; 56 Am.Jur., Waters, § 483 & § 485; 93 C.J.S. Waters § 76 b; 65 C.J.S. Navigable Waters § 82 d; and since the evidence clearly shows that the soil deposited in Little Sarasota Pass the night of the hurricane did not come from the lands of the defendants, the finding of the trial court in this regard must stand affirmed.
In another portion of its original opinion filed in support of the final decree of August 13, 1958, the trial court stated: "There is no doubt in the mind of the Court that if by accretion to [the lands in Little Sarasota Pass] during the interval between 1926 and the present, such accretions are now in the same geographical location as Casey Key formerly occupied in any part they are the property of the plaintiff. * * The Court is convinced that none of the lands in controversy constitute an accretion to Casey Key." In its supplemental opinion filed a few days later, the trial court reached this conclusion on the point: "Since the writing of the original opinion in this case, further study compels the conclusion that the two paragraphs which intimate *222 that the plaintiff might be entitled to accretions from the mainland if such accretions reach to and restore part of the island in the location from which it was washed away, should be withdrawn."
We agree with the finding of the trial court that none of the lands in controversy constitute an accretion to Casey Key. While the evidence in the record is to the effect that for a long period of time prior to 1926 Casey Key had been migrating steadily eastward toward Siesta Key and had doubtlessly moved completely outside the geographical limits of U.S. Government Lot 5 before the 1926 hurricane occurred, there is no evidence in the record which establishes with any degree of certainty that any portion of the washed-in lands that were against the western shore line of Siesta Key after the hurricane were accretions to the property claimed by the plaintiff as it existed before the storm.
In this state of the evidence we are not required to settle the point so ably argued by the parties in their briefs as to whether or not, or to what extent, the owner of a migrating island in the sea may claim accretions, when such island, as the result of erosion and accretions, has moved outside its original boundaries. Compare Van Dusen Investment Company v. Western Fishing Co., 63 Or. 7, 124 P. 677, 126 P. 604. Neither are we called on to settle the question whether, where an island has thus migrated beyond its original boundaries and a portion of it has then been suddenly washed away, the owner is entitled to accretions from a neighboring island when such accretions reach to and encroach upon the area formerly occupied by the washed-away portion. But see Buse v. Russell, 86 Mo. 209; and Note, 35 Am.St.Rep. 313.
In another portion of its original opinion filed in support of the final decree, the trial court stated this in respect to the contention of the plaintiff that it was entitled to the land formed in Little Sarasota Pass during the night of the 1926 hurricane: "* * * boundaries do not change by avulsion. This doctrine seems to the Court to be decisive of the questions here involved. Plaintiff relies on the doctrine * * * established in many cases relating to avulsions in rivers, that where the identical land can be traced to another location as the result of an avulsion, the owner may follow it and reclaim it as his property. But in no such case has the plaintiff prevailed so as to divest another land owner of his property * * *. And the Court cannot bring itself to hold that plaintiff can claim title held by another merely because soil which he formerly owned has moved upon the property of some other person or political organization * * *. The title to the bed of Little Sarasota Pass when it was a navigable stream was in the State of Florida, and the Court is of the opinion, obiter dictum, that such title was not divested by the filling up of the pass as the result of an avulsion. The fact that the soil which filled it came from land owned by the plaintiff's predecessor in title on Casey Key does not alter the situation * * *. Since the avulsions in the present case occurred before the passage of the recent legislation transferring title of sovereignty lands to the Internal Improvement Commission, obiter dictum, it seems to the Court that the title to the lands involved remains in the State of Florida in its sovereign capacity."
Later, in its supplemental opinion filed in the cause, the trial court had this to say in respect to the matter:
"Since the writing of the original opinion in this case * * * the Court has determined that the law of avulsion insofar as it is attempted to be applied in this case should be rejected as the law of Florida, partly because of the authorities which exclude such theory applied to seashores * * * and also * * * because of the impracticability of applying it intelligently * * * the Court prefers to adopt a firm *223 principle of law on avulsion in this state as it relates to land areas washed by the Gulf or the sea (as distinguished from rivers) than to leave the question open to uncertainty, and thus encourage vexations and ingenious litigation. In any event, as the Court has already announced orally to counsel for the parties, the Court has made a finding of fact that the lands formed against the uplands of the defendants cannot be identified as the lands which formerly constituted Casey Key in that area.
"Nothing said in this or the original opinion should be construed as determining the ownership to the property in question as being in the State of Florida. The State was not a party, and reference to the State as being the likely beneficiary of the hurricane which precipitated the formation of the land area in question was incidental. The final determination of the ownership of the land in others than the parties to this case is left open for adjudication, if the occasion arises to make any such adjudication. In summary, the Court has rejected the claims of the parties plaintiff and defendant to the land, and it is not called upon to affirmatively declare the ownership otherwise."
If we interpret these statements of the trial court correctly, the claim of the plaintiff to the lands that emerged in Little Sarasota Pass, from the soil and sand deposited there by the action of the elements during the 1926 hurricane, was rejected for two reasons; namely, that the evidence in the cause failed to establish that these soil deposits were washed or torn away from the lands of the plaintiff, on Casey Key; and that even if identifiable as lands formerly constituting Casey Key in that area, the plaintiff is not entitled to claim ownership because the soil and sand was deposited into waters belonging to the State of Florida and thereupon became sovereignty lands.
It is difficult for us to agree with the trial court that the evidence did not establish that the great bulk of the soil and sand washed into Little Sarasota Pass came from the property of the plaintiff. As we view the evidence respecting the peculiar physical condition of the area before and after the hurricane, the greater portion of these deposits could not have come from any other source. But however that may be, the mere fact that the deposits washed into the shallow waters of Little Sarasota Pass may have come from the lands of the plaintiff would not necessarily entitle the plaintiff to a decree in its favor.
Even if the deposits did come from this source, it is apparent that what occurred on the night of the 1926 hurricane to bring about the condition that existed the following day was the sudden and perceptible deposit of land of one riparian owner upon or against the shore of another riparian owner and upon the bed of an intervening tidal pass, the title to which was in the State of Florida. See 93 C.J.S. Waters § 79. The plaintiff cites cases which it contends supports the proposition that in these circumstances the title to the newly formed land in the tidal pass remains in the riparian owner from whose property the deposits came. Whatever the effect of the decisions cited may be, we do not think they stand for the proposition that in a situation such as is presented here a landowner may enlarge his property lines to an extent necessary to take in new lands thus formed, when they lie outside his original boundary lines, or claim title to such lands in their new location.
The rule we think should govern in such a situation is set forth in In re City of Buffalo, 206 N.Y. 319, 99 N.E. 850, 852, wherein it is stated: "When land bordering a body of water is increased by accretion  that is to say, by such a slow and gradual deposit of particles that its progress cannot be always measured even though its results may be discerned from time to time  the new land thus formed *224 belongs to the upland to which it attaches. By the same reason the rule is that, when the sea, lake, or navigable stream gradually and imperceptibly encroaches upon the land, the loss falls upon the owner, and the land thus lost by erosion returns to the ownership of the state. This is not the rule where the loss of the land occurs by avulsion, defined as the sudden or violent action of the elements, the effect and extent of which is perceptible while it is in progress. In such cases the boundaries do not change."
Undoubtedly, the rule, that boundaries do not change in such circumstances, was the rule applied by the trial court when it entered its final decree dismissing the suit of the plaintiff; for even though the opinion filed in support of the decree states that "the law of avulsion insofar as it is attempted to be applied in this case should be rejected as the law of Florida," the end results of the decree entered by the trial court could not have been reached except by the application of rules relating to avulsion.
This is made plain by the fact that in its final decree the trial court left all boundary lines of the parties to this appeal as they existed prior to the 1926 hurricane. It decreed, in effect, that the new land in Little Sarasota Pass did not belong to the plaintiff or the defendants but belonged to the sovereign, and that, consequently, the fee-simple title thereto could not be confirmed in the plaintiff. And since the evidence failed to establish with any degree of exactness that any certain portion of the disputed land was, immediately after the hurricane, within the boundary lines of plaintiff's property as they existed prior to the storm, the trial court ruled in its final decree, in effect, that the plaintiff was not entitled to any portion of said land or to accretions thereto that may have formed westward after 1926, even though at the time of suit such accretions may have reached and occupied the area formerly occupied by the property of the plaintiff before the hurricane occurred.
Because an appellate court does not reverse a trial court for erroneous reasons given but only for erroneous judgments made, it follows that the decree appealed from should be affirmed.
It is so ordered.
KANNER, Acting Chief Judge, and SHANNON, J., concur.