142 So.2d 335 (1962)
H.H. FORD and Lula Grace Ford, His Wife, and Robert Ford and Dorothy J. Ford, His Wife, Appellants,
v.
Walter S. TURNER, Jr., Appellee.
No. 2372.
District Court of Appeal of Florida. Second District.
May 23, 1962.
Rehearing Denied June 26, 1962.
*336 J. Hardin Peterson, Lakeland, and O.K. Reaves, Tampa, for appellants.
Sheppard & Woolslair, Ft. Myers, for appellee.
WHITE, Judge.
Appellants H.H. Ford and Robert Ford and wives were principal defendants in a quiet title suit which resulted in favor of the plaintiff-appellee Walter S. Turner, Jr. The litigation involves an apparent increment or increase of land in the form of an elongated strip physically attached to the southerly end of Captiva Island near Blind Pass in Lee County on the lower Gulf Coast of Florida.
Plaintiff Walter S. Turner, Jr. alleged and deraigned title in himself and complained *337 that the defendants H.H. Ford and wife wrongfully, by instruments of record, had attempted to convey and encumber parts of the subject land and had caused to be removed therefrom a number of trees. The litigants stipulated that no trees would be removed pending final disposition of the case. The defendants denied the material allegations of the complaint and averred generally that the plaintiff was not entitled to the relief sought. The chancellor held as set forth in the final decree:
"This suit was set down for trial before me and for three days I personally heard the testimony adduced by the parties and I examined and reviewed the documentary evidence and exhibits admitted in evidence herein. From a preponderance of the testimony of the lay witnesses, who actually saw what was physically happening over a long period of time, and of the expert witnesses; which testimony was confirmed by the documentary evidence and the exhibits, I find as follows:
"(a) The plaintiff, Walter S. Turner, Jr., is the fee simple owner of the land described in the Complaint;
"(b) The increase in the area of said land, as compared to the United States Government Survey of Government Lot 1 of Section 10 and Government Lot 2 of Section 11 in Township 46 South, Range 21 East, is the result of natural accretion physically attached to, and forming a part of, the plaintiff's said land and, therefore, is the property of the plaintiff; and
"(c) The equities of this suit are with the plaintiff and against the defendants:
"IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED:
"1. The plaintiff, Walter S. Turner, Jr., is hereby declared and decreed to be the owner in fee simple of the land set forth in the Complaint, situate, lying and being in Lee County, Florida, and described as follows:
"That part of Government Lot 1 of Section 10 and Government Lot 2 of Section 11 in Township 46 South, Range 21 East lying between and bounded by: (a) The North lines of said Sections 10 and 11; (b) The waters of Blind Pass; (c) The waters of the mouth of said Pass leading to the Gulf of Mexico; and (d) The waters of the Gulf of Mexico; as such lines and waters existed on December 11th, 1958, the time of the filing of the complaint herein.
"2. The plaintiff's title to said land be, and the same is hereby, quieted and established, and the claims, or alleged claims, of the defendants, and each of them, be and the same are hereby, barred, removed and decreed not to constitute clouds upon the plaintiff's title to said land.
"3. Any right, title or interest of the defendants, and each of them, claimed in and to said land be, and the same is hereby, cancelled and annulled, and the defendants, and each of them, are hereby enjoined and restrained from asserting or attempting to assert, any right, title, interest, claim or demand in or to said land, or any part thereof." (Emphasis ours.)
From the record and the findings of the chancellor, it would appear that at all times pertinent to the case the lands of the plaintiff and the lands of the named defendants have been in fairly close proximity but separated by a pass or channel. In other words, it was not shown or established that the lands of the respective parties were at any time actually contiguous each to the other. The record reveals, however, that the general topography of the involved area has altered considerably since the turn of the century. The great geodetic changes between 1900 and 1958 are reflected in the following sketches derived from exhibits *338 in evidence. The approximate relative location of the disputed tract, which purportedly "accreted" to the plaintiff's land, is indicated on Sketch 2.

*339 The essence of the defendants' position under their seven points on appeal is that the chancellor misapprehended the facts and misinterpreted and misapplied the law. They submit that the plaintiff failed to show that he was in possession of the land and, in particular, failed to establish that all the disputed land had actually formed contiguously to his main tract. The defendants rely largely on their contention, avowedly established by the evidence, that the emergence of much of the land in question was the result of the formation of sandbars and spits which, although ultimately adhering to plaintiff's land, are not true "accretions" belonging to the plaintiff but are mainly non-submerged sovereignty lands belonging to the State of Florida.
It is further urged on behalf of the defendants that some of the subject land that is not superimposed on sovereignty land, or become accreted thereto, extends over a portion of the defendant's land which previously eroded or became detached and submerged by avulsion through action of the 1926 hurricane, and that this recovered land rightfully belongs to the defendants even though now physically attached to land belonging to the plaintiff. The defendants also insist that ownership by accretion extends frontward only and not laterally.
According to the defendants' exhibits, the Ford property did originally front on the open Gulf of Mexico. A series of aerial photographs dated 1937, 1939, 1944, 1953 and 1958 show that Captiva Island has built up in a southerly direction until that island has almost completely paralleled Ford's original Gulf frontage, leaving only a navigable channel separating Ford's property and the "accreted" portion of Captiva Island with the Island fronting on the Gulf. The defendants claim that this accretion crossed and covered the same geographic location as part of their lot #7 on Silver Key that previously stood firm until it was submerged by the hurricane of 1926. The chancellor, however, factually discounted this avulsion theory and held that the existing topography was the result of a gradual accretion to the plaintiff's land.
The defendants adduced some opinion testimony to the effect that the northerly tip of Silver Key, being United States Government Lot 7 belonging to defendants Ford, had either eroded or was cut through by the hurricane of 1926 and that subsequent accretion to the plaintiff's land covered the same geographic location. i.e., the northerly tip of Silver Key. It is such portion that is claimed by the defendants Ford. The chancellor apparently considered this testimony too indefinite and conjectural to establish either the fact of avulsion or the precise consequence thereof. We have already noted plaintiff's contention, which the evidence tends to establish, that at all times since the turn of the century the defendants' lands and the lands described in the complaint have been separated by the pass or channel known as Blind Pass. The chancellor's findings in the foregoing respects will not be disturbed on appeal.
With reference to the contention that there was no showing that the plaintiff was in possession of the disputed land, it need only be observed that a plaintiff, whether in actual possession or not, may sue to quiet title as against an adverse claimant not in actual possession. 27 Fla. Jur., Quieting Title, § 9. A party may quiet title even where the defendant is in possession, unless the defendant objects and requires transfer to the common law side of the court. Griffin v. Bolen, 1942, 149 Fla. 377, 5 So.2d 690. The plaintiff must, of course, show prima facie title in himself. Hill v. Da Costa, 1913, 65 Fla. 371, 61 So. 750. The rule requiring a showing of title in the plaintiff is particularly applicable where suit is brought to enjoin a threatened cloud. Benner v. Kendall, 1885, 21 Fla. 584; 27 Fla.Jur., Quieting Title, § 21. In the foregoing respects the chancellor found for the plaintiff.
*340 Generally the margin or bed of a stream, or other body of water constituting a boundary, continues to be the boundary notwithstanding any accretion or erosion which changes the location of the body of water. The boundary lines of land so located thus extends or restricts as that margin gradually changes or shifts by reason of accretion or erosion. Feig v. Graves, Fla.App. 1958, 100 So.2d 192, 196. The newly formed land belongs to the owner of the land to which it is an accretion, and not to the one originally owning the land in that place. See 8 A.L.R. 640, 41 A.L.R. 395 and numerous cases cited.
One witness testified that the accretion to plaintiff's land extended southeastward approximately 9,000 feet. One of the defendants' contentions, as stated, is that accretion can not thus extend laterally but only frontward. Cited as supporting authorities are Town of Hempstead v. Lawrence, 1910, 70 Misc.Rep. 52, 127 N.Y.S. 949; Mulry v. Norton, 100 N.Y. 424, 3 N.E. 581; City of St. Louis v. Rutz, 138 U.S. 226, 11 S.Ct. 337, 34 L.Ed. 941; Archer v. Southern Ry. Co. in Mississippi, 114 Miss. 403, 75 So. 251; and Widdicombe v. Rosemiller, C.C., 118 F. 295. On analysis, however, these decisions are found to be of little persuasion.
Town of Hempstead v. Lawrence, supra, involved a navigable inlet that constantly shifted westward. It was estimated that the inlet moved 400 feet per year over a thirty year period. The constant westward shift of the inlet submerged the former beach and accreted a new beach behind it. The trial court held that the title to the submerged land remained in the riparian owner and that the movement of the inlet did not divest the title of defendants in the submerged beach. Such title, therefore, would be enforceable as to the parts of the original beach as should reappear above the water's surface. The trial court went on to hold that since defendants were never divested of ownership of the submerged land, the lateral accretion over defendant's submerged land could not belong to plaintiff to whose land the accretion had attached. The court dismissed the complaint, but the ruling was reversed in Town of Hempstead v. Lawrence, 1911, 147 App.Div. 624, 132 N.Y.S. 615, wherein the appellate court stated:
"This is not the case of an inundation or submerging of an island which subsequently reappears by reason of a recession of the waters. It is an actual cutting away of the soil which originally belonged to the defendants' property and carrying it away to the lands of the opposite proprietor, and depositing it in such a manner that it does not in the process of the change affix itself to the same location that it originally occupied, for the evidence is conclusive that for the most part the new beach is far south of the original beach. Under these circumstances, we think it was error for the learned court at Special Term to dismiss the complaint. Certainly the defendants are not entitled to the accretions which formed upon the lands of the plaintiff, and which are south of the lands which they originally owned."
The common law rule which vests title to soil formed along navigable waters by accretion or reliction in owners of abutting lands is the rule applicable in Florida. Paxson v. Collins, Fla.App. 1958, 100 So.2d 672, 674; Mexico Beach Corporation v. St. Joe Paper Co., Fla.App. 1957, 97 So.2d 708, 710. Unless excepted, title to these accretions passes with the title to the land to which the accretions are appurtenant. American Mortgage Corp. v. Lord, Fla.App. 1961, 132 So.2d 40.
In Siesta Properties, Inc. v. Hart, Fla. App. 1960, 122 So.2d 218, 223, Associate Judge Sebring speaking for this court said:
"The rule we think should govern in such a situation is set forth in In re *341 City of Buffalo, 206 N.Y. 319, 99 N E. 850, 852, wherein it is stated: `When land bordering a body of water is increased by accretion  that is to say, by such a slow and gradual deposit of particles that its progress cannot be always measured even though its results may be discerned from time to time  the new land thus formed belongs to the upland to which it attaches. By the same reason the rule is that, when the sea, lake, or navigable stream gradually and imperceptibly encroaches upon the land, the loss falls upon the owner, and the land thus lost by erosion returns to the ownership of the state. This is not the rule where the loss of the land occurs by avulsion, defined as the sudden or violent action of the elements, the effect and extent of which is perceptible while it is in progress. In such cases the boundaries do not change.'"
In Paxson, et al. v. Collins, Fla.App. 1958, 100 So.2d 672, Associate Judge E. Harris Drew emphasized the following quote from Mexico Beach Corporation v. St. Joe Paper Co., District Court of Appeal, 1st District, 97 So.2d 708, 710:
"In the United States, `the rule governing additions to land bounded by a river, lake or sea, has been much discussed and variously settled by usage and by positive law. Almost all jurists and legislators, however, both ancient and modern, have agreed that the owner of the land thus bounded is entitled to these additions. By some, the rule has been vindicated on the principles of natural justice, that he who sustains the burden of losses and of repairs, imposed by the contiguity of waters, ought to receive whatever benefits they may bring by accretion; by others, it is derived from the principle of public policy, that it is the interest of the community that all land should have an owner, and most convenient that insensible additions to the shores should follow the title to the shore itself.' The commonlaw rule which vests title to soil formed along navigable waters by accretion or reliction in owners of abutting lands is the rule applicable in Florida."
We have studied the authorities cited by defendants in support of their contention that accretion must be immediately in front of the land to which it has attached and that the owner cannot follow it laterally. See III Farnham, Waters and Water Rights, § 845(a), pgs. 2489-2490. Most of the cited cases, however, applied to rivers and streams or non-tidal waters where the owners' boundaries extended to the center of the stream bed in contradistinction to the instant case where the lands border tidal waters in which the title to the submerged land is held by the State of Florida in trust for the use and benefit of its citizens.
We would observe that the issues in the instant suit are determinable and binding only as among the particular litigants and all others claiming by, through or under them. The plaintiff, however, must prevail on the strength of his own title and not merely on the weakness of his adversary. The evidence here was conflicting, but the strength of the plaintiff's title was determined by the chancellor after full consideration of documentary evidence and extensive testimony of both experts and laymen.
In Pergament v. Pergament, Fla.App. 1959, 117 So.2d 26, 29, Judge Allen speaking for this court said:
"An appellate court does not retry a case but accepts a determination of facts made by the trial judge where the record discloses testimony from which the trial judge could have determined the facts * * * The truth or falsity of the testimony of various witnesses, the effect thereof, and the weight to be given the testimony of each witness are matters for the trier of facts to determine and not an appellate court."
*342 The court went on to quote King v. King, Fla.App. 1958, 107 So.2d 259, 261:
"* * * `The rule is that the chancellor's findings on the facts will be accorded the same weight as the verdict of the jury, and a decree solely on questions of fact will not be disturbed unless the evidence clearly shows that it was erroneous. Cobb v. Cobb, [1921] 82 Fla. 287, 89 So. 869.'"
The defendants finally contend that the chancellor abused his discretion in denying rehearing on motion to reopen the case when the defendants had evidence that a 1960 hurricane had broken through Captiva Island at the same place that Blind Pass existed prior to the 1926 hurricane,  as predicted by one of the defendants' expert witnesses. The defendants further protest that the decree included as a boundary the mouth of Blind Pass as it existed on December 11th, 1958 and not as of the date of the decree on December 12, 1960; in other words, that the 1960 hurricane separated Captiva Island in approximately the same spot of its southernmost point as it previously existed, thereby creating a new condition justifying a reopening of the case. The point is not well taken.
We note that the subject land was found as of December 11, 1958 to have accreted to the plaintiff's land. Subsequent severance by avulsion could not affect the title, at least with respect to non-submerged portions. See Siesta Properties, Inc., v. Hart, Fla.App. 1960, 122 So.2d 218, 222-224. It having been found that Silver Key was not severed from the disputed area by the 1926 hurricane, the new development could not enhance the defendants' position.
Florida is bordered by water on the east, south and west. The numerous islands or keys are constantly changing by various methods of accretion, alluvion, erosion, reliction and avulsion, giving rise to myriad problems. Public policy demands a definite standard of quieting title to these areas despite the fact that occasionally some hardship may occur. The chancellor appears to have perceived and applied the correct legal standards in this case. Other points raised on appeal are of a minor nature which we deem unnecessary to discuss.
The decree appealed accordingly is affirmed.
Affirmed.
SHANNON, C.J., and SMITH, J., concur.