# MILLENDER AND SON FISH COMPANY v DEPARTMENT OF NATURAL RESOURCES

## Case No. 86-1498

State of Florida, Division of Administrative Hearings

January 7, 1988 (Final Order entered on December 15, 1989)

### APPEARANCES OF COUNSEL

**J. Ben Watkins,** Watkins & Russell, for petitioner.

**Eugene E. McClellan, Jr.,** and **Ed Pantealeon,** Department of Natural Resources, for respondent.

### OPINION OF THE COURT

P. MICHAEL RUFF, Hearing Officer.

### *RECOMMENDED ORDER*

Pursuant to notice this cause came on for administrative hearing before P. Michael Ruff, duly designated Hearing Officer, on July 15, 1987, in Apalachicola, Florida.

This matter arose upon a notice of violation issued to Petitioner by Respondent on April 1, 1986, alleging that illegal construction and filling on state lands had occurred adjacent to the Petitioner's property bordering the Carrabelle River in Carrabelle, Franklin County, Florida.

The Notice of Violation directed Petitioner to remove the allegedly unauthorized structures and fill material placed waterward of the historic mean high water line within a time certain or to apply for an "after-the-fact permit" and lease within twenty days. The Petitioner failed to remove the materials allegedly placed waterward of mean high water and failed to apply for an after-the-fact lease within the time specified in the Notice of Violation, although the Petitioner did later apply for an after-the-fact lease. No apparent action has been taken on the after-the-fact lease application.

The cause came on hearing as noticed. The Respondent presented the testimony of Edwin G. Brown, Herbert G. Belhardt, IV, Doug Gilmore, Larry Taylor, Richard V. Holden, II, Roger J. Menendez, Gordon Roberts, Douglas A. Thompson, and Jody Miller. The Petitioner presented the testimony of Leo Hance, Walter H. Edwards, Carlton Millender, Percy Mock, Tommy Jack Massey, Sam Neel, Farris Millender, and George Cole. The Respondent presented the testimony of Susan E. Radford on rebuttal and Petitioner presented the testimony of Farris Millender on surrebuttal. The Respondent presented Exhibit 1-11 and 14-20, which were admitted into evidence. Petitioner's Exhibits A-E were admitted into evidence. The parties elected to have the proceedings transcribed and agreed upon an extended briefing schedule. The time constraints of Rule 28-5.402, Florida Administrative Code, are waived. The parties submitted proposed findings of fact and conclusions of law in a timely fashion and the proposed findings of fact are treated in this recommended order and are addressed as well in the appendix attached hereto and incorporated by reference herein.

The issues to be resolved in this proceeding concern whether the structure at issue (seawall and fill) was erected beyond the historic mean high water line bordering Petitioner's property on the Carrabelle River; whether that structure was authorized under the Emergency Authorization Permit issued by the U.S. Army Corps of Engineers, the Florida Department of Environmental Regulation and the Florida Department of Natural Resources on September 25, 1985; and whether the Department of Natural Resources is estopped from seeking removal of the concrete seawall and backfill.

## FINDINGS OF FACT

1. The Petitioner, Millender and Son Fish Company is a wholesale seafood business, with its principle place of business located on the banks of the Carrabelle River in Carrabelle, Franklin County, Florida. The business is owned and operated by Farris G. Millender. Mr.

Millender owns the real property on the north by Avenue "A", also known as State Road 10 which is the main street of the City of Carrabelle. The property is bordered on the southerly margin by the mean high water line of the Carrabelle River. Prior to September 2, 1985, there existed several wooden docks which ran lengthwise along the margin of the Carrabelle River on the waterward boundaries of the Petitioner's property. In the fall of 1985, the Carrabelle area was struck by two hurricanes; the first occurred on September 2, 1985, and the second in November, 1985. These two hurricanes together severely damaged the wooden docks, as well as Petitioner's buildings.

2. In March, 1985, the Petitioner had hired Edwin G. Brown, a registered surveyor, to survey his property. The survey was completed on March 18, 1985, and showed a line along the Carrabelle River identified as "approximate MHW line" (mean high water). The surveyor stated that this line represented the shoreline of Petitioner's property at the time the survey was done. Employees of the Department of Natural Resources verified each end of the Brown survey as being an accurate location of the line of mean high water. That survey also depicted the location of the Petitioner's docks and pilings which were later damaged by the storms. The approximate mean high water line lay landward of the location of Petitioner's existing docks and pilings. The survey also depicted a small concrete bulkhead along part of the boundary line designated as "approximate MHW line" on that survey.

3. On September 10, 1985, after the first of the two hurricanes struck, the Petitioner applied for a city building permit from the City of Carrabelle seeking to construct a seawall at the line of mean high water along that part of his property fronting the Carrabelle River. That permit was granted on September 17, 1985.

4. On September 25, 1985, after Hurricane Elena struck, an emergency permitting team comprised of representatives of the U.S. Army Corps of Engineers, the Florida Department of Environmental Regulation, and the Department of Natural Resources met with Farris G. Millender at his place of business and inspected the hurricane damage. Following that inspection, an emergency authorization permit (APL0029) was issued. That permit described the pre-existing condition of the property as a "functional off-loading seafood dock" and it authorized the Petitioner to rebuild the docks and piers to existing pre-disaster condition. That is, he was authorized to build the docks and piers to the same dimensions, consisting of a "6' x 300' pier, 20' x 45' pier, and 6'-10' x 800' pier and docks behind building." The members of the inspection team saw no evidence of any concrete bulkhead or

seawall existing at or near the site of the Petitioner's damaged wooden docks.

5. The Petitioner asked the team members if the permit authorization would allow the construction of a concrete seawall. He was told that the emergency authorization only permitted the building of wooden docks and structures as they had existed previously. He was told that the construction of a concrete seawall would have to be permitted through normal permit application procedures. The emergency permitting process was designed to allow property owners to rebuild structures damaged by the hurricane in the same configuration, as to size, type of material and intended purpose, as those structures which existed prior to the emergency situation caused by the hurricane.

6. On October 11, 1985, Mr. Powell Rivers called Mr. Larry Taylor of the Department of Environmental Regulation and inquired, on Petitioner's behalf, concerning whether bulkheading and backfilling was authorized under the emergency permit. Mr. Taylor informed Mr. Rivers that the emergency permit only authorized repair of the structures as they existed prior to the storm disaster. Mr. Taylor informed him that any additional work or change in the pre-existing installation, such as bulkheading and backfilling, would require a permit which must be obtained through normal permit application procedures.

7. The Petitioner, however, proceeded to construct a concrete bulkhead along the Carrabelle River adjacent to his property and backfilled dirt or soil behind the bulkhead for its entire length. The bulkhead was constructed between September, 1985 and February, 1986. It is approximately 505 feet long and lies 20 to 55 feet waterward of the March 18, 1985, "approximate MHW line" surveyed by Edwin Brown. The area below the mean high water line encompassed by the seawall or bulkhead and attendant fill material is 0.446 acres.

8. In response to a report by the Florida Marine Patrol, representatives of the U.S. Army Corps of Engineers, the Department of Environmental Regulation (DER) and the Respondent inspected Petitioner's property on January 24, 1986. The concrete seawall itself was then nearly complete, but the backfilling had not yet been done. The Petitioner was informed at this time that the structure was not authorized under the above-mentioned emergency permit and that state and federal formal permitting was necessary.

9. The Respondent formally notified the Petitioner of the encroachment of the construction in question on state-owned lands, without consent, by letter dated January 28, 1986. The Respondent requested the Petitioner to take immediate action to comply with the Respon-

dent's rules and applicable state law. The Petitioner responded to this notice by stating that his position was that the work was authorized by the emergency authorization issued on September 25, 1985. In this connection, the Petitioner originally testified that Susan Radford, an employee of the Respondent, signed a handwritten note on November 21, 1985, giving Petitioner permission to construct the concrete seawall and related backfilling, below mean high water. The Petitioner recanted that testimony, however, following testimony of Susan Radford, on rebuttal, to the effect that she had not met the Petitioner, had never visited the site and had never signed any form of consent for Petitioner to perform the work in question under the aegis of the emergency permit.

10. Based upon the Petitioner's response to the notice of January 28, 1986, the Respondent conducted an investigation and confirmed that, indeed, in its view, the construction was located on state-owned lands and was not authorized by the emergency permit issued on September 25, 1985.

Accordingly, on April 1, 1986, the Respondent notified the Petitioner, with a formal Notice of Violation, that his construction was in violation of Chapter 253 and RUle 16Q-14.03(1) and (4), *Florida Administrative Code*. He was ordered to cease and desist any further construction and given 20 days to apply for an "after-the-fact lease" or else to remove all unauthorized materials placed waterward of the referenced mean high water line. The Petitioner thereafter filed a petition for administrative hearing. The materials Petitioner placed waterward of mean high water have not as yet been removed. The Petitioner at a later time, however, applied for an "after-the-fact lease."

11. The Carrabelle River is formed by the confluence of the New River and the Crooked River in Franklin County, Florida. It flows south into St. George Island Sound on the Gulf of Mexico. The river has been variously referred to in times past as the Crooked River, the New River and the Carrabelle River. It is a tidally-influenced water body at the point in question. Its shoreline boundaries are determined at the elevation of mean high water.

Historically, Carrabelle and the surrounding environs, including the Carrabelle River area, has been the site of Indian villages, timber harvesting operations and seafood harvesting and processing industries. The river was traveled by boat by a surveyor as early as the year 1806, as far as the source of the New River and Crooked River. In 1840, the river was used as the means of transport for a military expedition. In 1882, the settlement of Rio Carrabelle, now called Carrabelle, had been

established and timber was being transported on the river by logbooms or rafts moved by steamboats. Although the mouth of the river was partially obstructed by an oyster bar and sand, the channel contained approximately 4 ½ feet of water at low tide in 1827 and by 1895 was being travelled by lighters, mail packets, tugs, and other vessels drawing 3' to 5' of water, plying between Carrabelle and Dog Island Harbor. (See Respondent's Exhibits 1, 2 and 3 in evidence.)

12. The existence, location and general size of the New River and Crooked River, and their connection with St. George Sound via the Carrabelle River, has been shown on an 1846 topographic map of the state, as well as on an 1855 survey fo the Apalachicola Land Company. The Crooked River was declared navigable by the Florida legislature in 1852, and in 1889, in a Memorial to Congress, the legislature described the importance of the river and the commerce then being shipped from Carrabelle via the river and its mouth.

13. The water immediately adjacent to the Petitioner's property was part of a tidal slough or lagoon running parallel to and slightly north of the main channel of the Carrabelle River, at least as early as 1913. The lagoon was closed from the river on the west end by an intervening strip of land, but opened on its east end into the main channel of the river near Petitioner's property. On the south side of the lagoon there existed a series of marshy islands which were inundated at high tide. The water depth in the slough ebbed and flowed with the tide, but the connection between the east end of the slough and the main river channel near Petitioner's property was always inundated, even at low tide.

14. Since the early part of this century, through 1965, the slough was capable of floating logs and small boats, typically oyster and mullet skiffs, even at low tide. In 1943, when the Petitioner's father purchased the property in question, which the Petitioner now owns, a fish processing house and dock existed along the shore of the property. The Petitioner's father purchased the property for the purpose of operating a wholesale fish business and the Petitioner was able to transport mullet to and from the main channel of the river to the docks along the front of his property in a "mullet skiff," which is small boat of shallow draft typically used by commercial fishermen in the area.

15. By 1954, the width of the slough along the Petitioner's property had increased and the marsh islands separating it from the main body of Carrabelle River had become smaller. More docks had been constructed along the Petitioner's shoreline and the adjacent property

208

farther up the slough. Boats were able to navigate and moor to these docks. Additionally, since at least as early as 1913 through the present time, the shoreline along the Petitioner's property had been covered and uncovered by the daily ebb and flow of the tides in the Carrabelle River and in the slough.

16. Thus, from the early part of this century to the present time, the waters adjacent to the Petitioner's property have been susceptible to navigation by small boats and skiffs used commercially by oyster and mullet fishermen. In 1965, the U.S. Army Corps of Engineers deepened the main channel of the river and the waters near the Petitioner's property, enabling larger vessels to dock alongside Petitioner's property. The Petitioner and his witnesses testified to substantial erosion which has occurred along Petitioner's shoreline over the years, allegedly as a result of dredging activities of the Corps of Engineers. However, aerial photographs taken by the Department of Transportation in 1953, 1965 and 1977, during periods at or near mean high tide, show a shoreline location and configuration essentially the same as that existing when it was surveyed by Edwin Brown in March of 1985. The Petitioner's wooden pilings, which now form the waterward boundary of the new seawall, were part of a wooden dock which was located at the same place prior to the 1965 dredging activities by the Corps. It was used to dock and unload fishing boats prior to 1965.

## CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction over the parties to and the subject matter of this proceeding. Section 120.57(1), *Florida Statutes.*

Ownership of all state sovereignty lands is vested in the Board of Trustees of the Internal Improvement Trust Fund, which is charged with the administration, management and protection of such lands. Section 253.03, *Florida Statutes.* The Board of Trustees of the Internal Improvement Trust Fund, through its staff, the Division of State Lands within the Department of Natural Resources, is authorized to take necessary action for the protection of such lands, including imposition of fines, issuance of cease and desist orders and redressing damages or trespass to state lands caused by the placement of fill or the building of temporary or permanent structures on state lands without the consent of the Board of Trustees. Section 253.04, *Florida Statutes.*

The applicable rules of the Division of State Lands at issue are Section 18-14.003(1), (3) and (4), *Florida Administrative Code.* These rules proscribe the willful damage of state land by the placement of fill thereon or by the building of permanent or temporary structures

**209**

thereon without the consent of the Board of Trustees. Evidence adduced by the Respondent, supportive of the above findings of fact, establishes the location of the line of mean high water of the Carrabelle River as is depicted in the survey of March 18, 1985. The Respondent also established the location and dimensions of the Petitioner's seawall and attendant backfilling and established that the installation lies waterward of mean high water. Additionally, it has been established that the Carrabelle River is a navigable stream. Indeed, it has been established that since the early part of the present century, through the present time, the waters adjacent to the Petitioner's property, since before the Petitioner acquired the property, have been susceptible to navigation by small boats and commercial fishing skiffs and has been so navigated by such craft. The waters adjacent to the Petitioner's uplands have always been connected to the Carrabelle River and have been subject to the ebb and flow of the tides.

When Florida was admitted into the Union on March 3, 1845, by act of Congress codified in 5 Statutes 742, Florida, as a sovereign state, became the owner of all lands lying under the navigable waters within the state, including shores and spaces, if any, between the ordinary low water mark and the ordinary high water mark and also *all tide lands.* See *Martin v Busch,* 112 So. 274 (Fla. 1927). Tide lands are those lands which are covered by the ordinary daily tides. *Ellis v Gerbing,* 42 So. 353 (Fla. 1908). Navigable waters are those which are capable of practical navigation for useful purposes or are of sufficient capacity and volume of water to float to market the products of the country, including logs, either singly or in rafts. *Bucki v Cone,* 6 So. 160 (Fla. 1889). The capacity for navigation and not the actual usage for that purpose, determines the navigable character of the waters. The ability of a water body to be traversed by boats drawing 6" of waters most of the year has been held to be sufficient for navigability. See *Broward v Mabry,* 50 So. 826 (Fla. 1909). Moreover, the navigable character of waters is not altered by the non-navigable nature of its shores or outer limits or the fact that the water is not navigable during the entire year. See *Martin v Busch, supra.*

The Petitioner does not deny placement of the fill and the construction of the seawall waterward of the line of the mean high water, as established by the Brown survey. Petitioner rather maintains that there is no violation of the statutes and rules at issue because the Petitioner, rather than the state, owns the underlying submerged lands. The Petitioner also maintains that he obtained consent from the Respondent prior to construction of the seawall.

The Petitioner's claim to ownership of the waters and the submerged

lands beneath them adjacent to his upland property and on which the seawall and backfill has been placed, is based on the premise that the waters involved were not navigable in the past, as well on his claim that his upland property has eroded away and been submerged in the area of the installation of the seawall and backfill, as result of the dredging activities conducted by the U. S. Army Corps of Engineers.

The preponderant weight of the evidence, supportive of the above findings of fact, however, showed that the waters adjacent to the Petitioner's upland property were always connected to the Carrabelle River, insofar as the evidence in this proceeding shows, and were subject to the ebb and flow of the tides. Therefore, notwithstanding the issue of navigability, such submerged lands are tide lands within state ownership. Moreover, the evidence establishes that the waters adjacent to the Petitioner's upland property were capable of and were actually used for practical navigation by small commercial fishing boats commonly used by commercial seafood fishermen to transport their catch of mullet, oysters and the like to market. The waters adjacent to the Petitioner's property were historically capable of floating sawlogs. Such usages are sufficient indicia of navigability to establish state sovereignty ownership of the lands in question, lying below the mean high water mark.

The Petitioner produced no competent, substantial evidence which could establish that the Respondent in any way consented or participated in the dredging conducted by the Corps of Engineers which Petitioner claims caused erosion to his upland property. No such evidence has been presented which would demonstrate a nexus between the dredging and the purported erosion or which demonstrates that the line of mean high water would have been located waterward of the current seawall and backfilling, but for the erosion which Petitioner claims was caused by the Corps' dredging. The aerial photographs in evidence, taken from 1953 through 1985 were taken at or near the time of mean high water. Although these photographs depict some change in the configuration of the shoreline in the vicinity of the Petitioner's property, none of them show a shoreline configuration which is near the location of the current waterward extent of the Petitioner's seawall and backfilling installation which could support Petitioner's claim that, if erosion had not occurred, the line of mean high water would have been located waterward of that installation and that thus it was not placed on sovereign lands. Finally, it should be noted, that Petitioner's own testimony establishes that the wooden pilings which mark the waterward extent of Petitioner's present seawall, were constructed in the 1940's prior to any dredging activities near Petitioner's property. If

211

Petitioner's statement that the line of mean high water was once waterward of the current seawall location were accurate, those wooden docks and mooring pilings would necessarily have been located on dry land and above mean high water and could not have been utilized for customary mooring and dockage purposes even at high tide. In fact, the evidence reflects that those pilings were so used.

The general rule, at common law, is that property ownership boundaries along navigable waters change with erosion and accretion. The party asserting an exception to that rule bears the burden of proof. *Ford v Turner,* 142 So.2d 335 (Fla. 2d DCA 1962). Even when the erosion or accretion results from artificial activities, such as dredging, the boundary line will still change, if the beneficiary of that boundary change neither consents to nor participates in the artificial activities which caused the change. *Board of Trustees of the Internal Improvement Trust Fund v Sand Key Associates, Ltd.,* — So.2d —, 12 FLW 349 (Fla. 1987). Even assuming that Petitioner had adduced sufficient evidence to demonstrate erosion to his property as a direct result of dredging by the U.S. Corps of Engineers such that a boundary shift occurred to the Respondent's benefit, there is no evidence to show that Respondent consented to nor participated in that dredging project in any manner. In short, the competent, substantial evidence adduced is insufficient to support a conclusion that the location of the boundary line between the Petitioner's property and Respondent's submerged land was other than that shown on the March 18, 1985 survey.

The Petitioner also maintains that he obtained consent for the installation of the subject structure from the Respondent through actual consent based upon the issuance of the emergency permit and alleged consent embodied in the handwritten note supposedly granting him permission to install the structure in question. He also contends that there was implied consent, based upon the Respondent's alleged failure to timely take action when it became aware of or was on notice of the installation of the seawall and backfill.

In this connection, the evidence demonstrates that the emergency permit issued by the Respondent did not authorize construction of a concrete seawall and backfilling below the mean high water line. The evidence does not reflect that the Respondent was a party to or had any knowledge of the handwritten note offered by Petitioner in evidence in support of his theory that Respondent consented to the installation of the seawall and backfill. Although the Petitioner maintained that a concrete seawall and backfill existed waterward of the mean high water line on the date of the emergency permit, the March 18, 1985 survey, commissioned by the Petitioner showed only a small

212

concrete seawall located landward of mean high water. The absence of a pre-existing concrete seawall or bulkhead waterward of the shoreline of Petitioner's property was also corroborated by the testimony of the employees of the various agencies who inspected the site on September 25, 1985, for purposes of the emergency hurricane damage repair permitting being conducted at that time.

Concerning the issue of "implied consent", the Petitioner maintained that a year elapsed between the initiation of construction and the report of the violation, during which time members of the Florida Marine Patrol, representatives of the department, observed the construction activities on a daily basis. However, the documents introduced by Respondent established that Petitioner was indeed notified of the suspected violation four days after an on-site inspection was made by Respondent's personnel and few than four months after construction was initiated. The Petitioner constructed the bulkhead and backfilling between September, 1985 and February, 1986. During the time the concrete seawall and backfill was under construction, but not yet complete, on January 24, 1986, representatives of the Corps of Engineers, the DER and the Respondent inspected Petitioner's property and informed the Petitioner that the structure was not authorized and that state and federal consent was necessary. Also, by letter of January 28, 1986, the Petitioner was notified of the encroachment of that construction on state owned lands and was requested to comply with applicable statutes and rules with regard to it. Thereafter, on April 1, 1986, the Respondent sent a formal Notice of Violation to the Petitioner, informing him that the construction was in violation of Chapter 253 and Rule 16Q-14.03(1) and (4), *Florida Administrative Code,* and ordering corrective action. In view of the findings of fact in this regard, it must be concluded that no actual or implied consent was obtained by the Petitioner justifying the construction of the installation waterward of the established mean high water line.

The final issue to be determined concerns whether the Petitioner's activities, at issue, were willfully undertaken with knowledge of state ownership of the lands upon which the installation was placed, as provided for in Section 253.04, *Florida Statutes,* and Rule 18-14.003, *Florida Administrative Code.* Pursuant to Section 177.28, *Florida Statutes,* the legislature has declared the boundary of sovereign ownership of navigable waters to be the line of mean high water. Knowledge of that legislative enactment must be attributed to the Petitioner. Moreover, as early as Marhc, 1985, the Petitioner, through his own boundary survey, was aware of the approximate line of mean high water and used that survey as a basis for an application for a city

213

building permit to construct the seawall along the mean high water boundary of his property as shown in the survey. On September 25, 1985, when the emergency permit was issued, the Petitioner knew of the Respondent's claim to the line of mean high water and was specifically told that further consent from the Respondent would be necessary to construct a concrete seawall waterward of the mean high water line. The necessity for that consent was communicated to the Petitioner's agent in October, 1985, and again to Petitioner personally, in January, 1986.

It is clear that the Petitioner knew the boundary of state ownership prior to, during and after construction of the seawall and filling and was aware of the consequent need for consent from the Respondent. The Petitioner, however, willfully constructed the installation on state owned submerged lands without obtaining such consent and without establishing his right to construct that installation waterward of the mean high water line, through formal permitting proceedings.

In summary, it has been established that the Carrabelle River was navigable for customary modes of transport as of March 3, 1845 when Florida became a state. The State of Florida is the sovereign owner of the Carrabelle River, including those lands adjacent to and connected with the river which is normally covered by the ebb and flow of the tides. The boundary line separating the Petitioner's upland property from the state owned submerged lands is the line of mean high water as established by the survey performed on March 18, 1985, at Petitioner's behest. It is concluded that the Petitioner placed or caused to be placed a concrete bulkhead, and fill materials associated therewith, on sovereignty lands of the state with knowledge of the boundary line of those sovereign lands and with knowledge that consent from the Respondent had not been obtained. It has thus been established that Petitioner has violated Section 253.04, *Florida Statutes,* and Rule 18-14.003(1) and (3), *Florida Administrative Code.*

## RECOMMENDATION

Having considered the foregoing Findings of Fact, Conclusions of Law, the evidence of record, and the candor and demeanor of the witnesses, it is, therefore

RECOMMENDED that a final order be entered by the Respondent, Department of Natural Resources, finding the Petitioner in violation of the authority cited next above and ordering such corrective action as is authorized by Chapter 253, *Florida Statutes,* and Chapter 18-14, *Florida Administrative Code.*

DONE and ORDERED this 7th day of January, 1988, in Tallahassee, Florida.